**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
STEPHEN BIEN,

                                    Petitioner,

                -against-

JOSEPH T. SMITH, Superintendent, Shawangunk
Correctional Facility,

                                    Respondent.
-------------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
05CV6118 (ADS)(ARL)


<u>**APPEARANCES**</u>

**STEPHEN BIEN**
<u>Pro Se</u> Petitioner
00-A-0531
Shawangunk Correctional Facility
P.O. Box 700
Wallkillm N.Y. 12589

**THOMAS J. SPOTA**
District Attorney of Suffolk County
Criminal Courts Building
200 Center Drive
Riverhead, NY 11901-3388
        By:    Guy Arcidiacono, Assistant District Attorney

**SPATT, District Judge.**

Presently before the Court is a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by Stephen Bien ("Bien" or the "Petitioner"). For the reasons that follow, the petition is **denied**.

## I. BACKGROUND

### A. Procedural History

Stephen Bien petitions this Court pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus. The Petitioner seeks relief from his December 2, 1999 conviction, following a jury trial in County Court, Suffolk County, New York (Ohlig, J.), on one count of murder in the second degree pursuant to N.Y. Penal Law §125.25(1), also known as "intentional murder." The Petitioner was found not guilty on one count of "depraved indifference murder" pursuant to N.Y. Penal Law § 125.25. The charges arose out of the June 6, 1998 death of Janet Rispoli Zachman ("Rispoli").

After his conviction on December 2, 1999, the Petitioner was sentenced to an indeterminate term of 25 years to life imprisonment. The New York Appellate Division, Second Department, affirmed the conviction, *People v. Bien*, 1 A.D.3d 442, 766 N.Y.S.2d 895 (2d Dep't 2003), and the New York Court of Appeals denied leave to appeal, *People v. Bien*, 1 N.Y.3d 624, 808 N.E.2d 1282, 777 N.Y.S.2d 23 (2004). In addition, the Appellate Division, Second Department denied Bien's application for a writ of error coram nobis to vacate, on the ground of ineffective assistance of appellate counsel, the 2003 affirmance of his conviction. *People v. Bien*, 12 A.D.3d

615, 784 N.Y.S.2d 376 (2d Dep't 2004).  The New York Court of Appeals also denied

leave to appeal this decision.  *People v. Bien*, 4 N.Y.3d 796, 828 N.E.2d 88, 795

N.Y.S.2d 172 (2005).

On December 28, 2005, Bien filed a § 2254 petition *pro se*, alleging: (1) that

the trial court improperly refused to instruct the jury on the lesser included offense of

manslaughter in the first degree; (2) that his right to a complete defense was violated

by the trial court's refusal to allow him to present evidence of extreme emotional

disturbance and to instruct the jury on the defense of extreme emotional disturbance;

(3) lack of an impartial forum; (4) prosecutorial misconduct; (5) ineffective assistance

of trial counsel; and (6) ineffective assistance of appellate counsel.

The Petitioner submitted a memorandum in support of his habeas corpus

petition.  In the memorandum, the Petitioner alleges that he was deprived of the right

to present a complete defense because the trial court refused to allow defense

psychologist, Dr. Jaime Greene, to give her opinion of whether the petitioner was

acting under an extreme emotional disturbance at the time of Rispoli's death.  In

addition, the Petitioner alleges that the trial court erred when it refused to charge the

jury regarding the affirmative defense of extreme emotional disturbance.

Further, the Petitioner claims that the trial court erred when it refused to charge

the jury on the lesser included offense of manslaughter in the first degree. The

Petitioner contends that the evidence submitted at trial, when viewed in a light most

favorable to him, supports a view that the Petitioner did not intend to kill Rispoli, but

3

instead intended only serious physical injury. The Petitioner argues that the trial court's refusal to charge manslaughter violated his Sixth and Fourteenth Amendment Constitutional rights.

The Petitioner also contends that both his trial and appellate counsel were ineffective. Specifically, the Petitioner states that his appellate counsel failed to raise several key issues, including the ineffective performance of the Petitioner's trial counsel, the denial of an impartial forum, and prosecutorial misconduct. In addition, the Petitioner claims that his trial counsel was wholly ineffective because he failed to question the arresting officer regarding his conclusion that the Petitioner was not intoxicated at the time of his arrest without the benefit of a blood alcohol content test. In addition, the Petitioner claims that his trial counsel was ineffective because he failed to object to the apparent bias of the trial judge and inflammatory statements made by the prosecutor.

Finally, the Petitioner contends that he was denied an impartial forum because of the trial judge's alleged bias and the alleged inappropriate conduct by the prosecutor. In particular, the Petitioner points to the prosecutor's cross-examination of him, where she asked "At what point does your memory fail on the night Rispoli was murdered?" When the defense objected to the use of the term "murder," the court responded that "she didn't die naturally . . . . It wasn't a natural death, right? We heard from the medical examiner who testified when they conducted the medical examinations. Overruled. Continue." Further, the Petitioner states that the trial judge

exhibited bias at pre-trial hearings by telling defense counsel: "You should tell your client to start remembering what happened that night." Finally, the Petitioner states that the bias of the trial court was further evidenced by the court's statement at sentencing that "the charade is over Mr. Bien the jury didn't believe you, nobody believes you."

The Petitioner further claims that the prosecutor made inflammatory and prejudicial remarks at the trial. Specifically, the Petitioner alleges that the prosecutor's closing statement was prejudicial: "It's been about excuses, mainly in the form of a large vodka bottle or any other bottle that this defendant has been hiding behind his entire life. . . . This case has never been about a man, and when I talk about him I truly use the word man loosely." Further, the Petitioner contends that the prosecutor made inappropriate comments at sentencing: "You are an individual who, your whole life, have committed action and violence against the people around you and have used the alcohol bottle to hide behind." Finally, the Petitioner contends that the prosecutor wrongfully harped on the missing receipt for vodka purchased by the Petitioner on the night of Rispoli's death and also presented false evidence by offering expert testimony by an individual unqualified in the area of his testimony.

**B.    Factual Background**

On June 6, 1998, Janet Rispoli was killed by her boyfriend, Stephen Bien at the apartment the couple shared with Rispoli's children Marie, 22, and Nicole, 14, and Marie's 10-month old daughter, Kelly, in Holbrook, New York. Rispoli and Bien had

been a couple for approximately one year and had lived together for six months. On the day of Rispoli's death, the couple had been arguing and Rispoli returned the engagement ring that Bien had given to her in April of the same year.

1.     Pertinent Portions of the Prosecution's Case

a.)     Testimony of Monica Baran

Monica Baran testified that she met Janet Rispoli in Alcoholics Anonymous ("AA") and had been her AA sponsor for approximately six and a half years prior to her death. (Tr. 505–06).[1] Baran testified that Rispoli had three children, and lived in Holbrook, New York with two of her children, Marie and Nicole. (Tr. 507–08). Baran stated that Rispoli and Bien had been dating for about a year and the two had arguments during their relationship, which involved "physical confrontations." During an argument which occurred about one month before Rispoli's death on June 6, 1998, the petitioner "jumped on her and she had to kick him off." (Tr. 510–11). Baran stated that she spoke to the petitioner about this incident and told him that it was "not sober behavior and was not acceptable to Janet." (Tr. 511). Baran also testified that the petitioner was "very jealous of the children and very possessive of Janet." (Tr. 511).

One June 6, 1998, in the afternoon, Baran was on the telephone with Rispoli

---

[1]     Unless otherwise indicated, "Tr." refers to the transcript of the trial testimony and proceedings.

while Rispoli and the petitioner were involved in an argument. Baran testified that Rispoli called her after the petitioner asked Rispoli to return the engagement ring he had given her in April. Baran stated that after Rispoli handed the ring to the petitioner, she heard him say "Are you sure you don't want to wear it anymore?" (Tr. 513). Baran stated that based on the tone in his voice at the time of this exchange, she perceived the Petitioner to be "very angry." (Tr. 513). Baran heard Rispoli tell Bien not to return home, but to return another day to pick up his belongings. (Tr. 515). Baran testified that Bien "mumbled something in an angry voice." (Tr. 516). Baran stated that she recommended to Rispoli that she "have people with her that evening" because she was concerned for her friend's safety. (Tr. 516).

In the days preceding June 6, 1998, Baran stated that she had several telephone conversations with Rispoli. The couple was scheduled to have dinner at Bien's mother's house in honor of his grandmother's birthday. (Tr. 513). Rispoli did not want to go, and wanted to stay home with her daughter and granddaughter. Baran stated that Bien was angry about Rispoli spending time with her children and her granddaughter. (Tr. 513–14).

Baran received another call from Rispoli at about 10pm on June 6, 1998. (Tr. 517). Baran testified that Rispoli told her that Bien was outside her house on the hood of his car and had been drinking. (Tr. 518). Baran testified that Rispoli seemed frightened and she told her to hang up and call 911. (Tr. 518). Baran waited approximately five minutes, and then called Rispoli back.. (Tr. 518). Baran testified

that she heard the dogs barking and then heard Rispoli say "he's in the house." (Tr. 519). Baran heard Rispoli's granddaughter start to cry. (Tr. 519).

Baran heard the following statements over the telephone: Rispoli said: "Please go outside. The police are on the way." The Petitioner said: "You like chaos? You like chaos?" Nicole, Rispoli's daughter said: "Mommy never did anything to you. Please go wait outside." Petitioner said: "Don't even go there, Nicole." (Tr. 520). Baran stated that she heard someone going through a utility drawer (Tr. 521). Baran testified that she then heard a struggle, and Rispoli saying: "Get off of me. Get off of me. What are you doing?" and "Get off me. You're hurting me. What are you doing? Stop it." (Tr. 521–22). Then Baran stated that the sounds of the struggle ended and Nicole picked up the phone and said to Baran "I think he killed Mommy." (Tr. 522). Baran also heard Nicole say "Steve, help Mommy. Look at all the blood. Stephen, help Mommy." (Tr. 523–28).

Baran also stated that Rispoli told her that in the past, Petitioner "had tried to choke her." (Tr. 536). Baran testified that Rispoli wanted to end the relationship, but "I think she was afraid," and that Bien had been in a "jealous rage" on "more than ten occasions." (Tr. 537–38).

### b.) Testimony of Robert Phillips

Robert Phillips testified that he lived upstairs from Janet Rispoli and her family for approximately one year prior to June 6, 1998. (Tr. 542–43). Phillips testified that he did not know Rispoli or Bien very well, but he would talk with Bien

from time to time.  (Tr. 543, 554).  On the night of June 6, 1998, Phillips was home with his wife, watching television when he was distracted by the sounds of an argument coming from the lower apartment.  (Tr. 544–45).  He heard Bien yell: "You embarrassed me in front of my mother."  (Tr. 558).  Phillips testified that the argument went on for about ten minutes when he heard banging followed by the sound of kitchen utensils hitting the floor.  (Tr. 545–46).  Phillips testified that he turned off the televison and his wife started to walk downstairs when he heard Rispoli's daughter shout:  "You're stabbing my mother."  (Tr. 547).

Phillips testified that he ran outside and entered Rispoli's portion of the house and saw blood all over the apartment.  (Tr. 547–48).  He followed the blood-trail from the kitchen down the hallway into one of the bedrooms.  (Tr. 548–49).  He observed Rispoli laying face down and the defendant standing over her.  (Tr. 549).  Phillips testified that he ordered Bien out of the room and began attending to Rispoli.  (Tr. 550).  He pulled her over looking for wounds, removed his shirt and used it to cover a wound to her neck.  (Tr. 550).  Phillips stated that Bien came back into the room and when he ordered him to leave again, Bien stated: "I gotta get my shirt," and then went to a drawer and retrieved a shirt.  (Tr. 551).  Phillips perceived Bien's demeanor as one of arrogance towards Rispoli.  (Tr. 551).

Phillips testified that he did not observe Bien stumble or fall and there was nothing in his appearance or speech that lead him to believe that Bien was intoxicated. (Tr. 552).

### c.) Testimony of James Nickdow

Police Officer James Nickdow testified that he had been with the Suffolk County Police for about ten years when he was dispatched to the home of Janet Rispoli on the evening of June 6, 1998 for a "violent domestic with a stabbing." (Tr. 564–66). Upon arriving at the residence, Officer Nickdow checked Rispoli's condition and testified that "there was no pulse and no breathing." (Tr. 566–67). He administered CPR on Rispoli and got no response, he continued to administer CPR until the fire department rescue unit arrived. (Tr. 567–68). Officer Nickdow testified that from the time he arrived at the residence until the time Rispoli was pronounced dead at the hospital, he did not see her regain consciousness or exhibit any signs of life. (Tr. 569–70).

### d.) Testimony of Theresa Daddio

Theresa Daddio testified that she had met Rispoli through AA and developed a close friendship. (Tr. 643–44). Daddio stated that she met Bien through Rispoli and the two were co-habitating in June of 1998. (Tr. 645). Daddio stated that as of June 6, 1998 Rispoli and Bien's relationship was tense, including instances of physical confrontations. (Tr. 646).

Daddio visited with Rispoli at her house at about 2:15pm on June 6, 1998 and stayed for about an hour. (Tr. 646–47). Daddio stated that she observed the Petitioner during her visit and he was upset because Rispoli asked him to lay down in another room of the house because her daughter, Nicole was asleep in their room. (Tr. 648).

Daddio stated that Bien was mumbling and grunting and mostly sat in his car during her visit. (Tr. 648). Before leaving that afternoon, Daddio observed that Rispoli seemed nervous and she told Rispoli that if she needed her to page or call. (Tr. 649).

Later that afternoon Rispoli telephoned Daddio and informed her that she and Bien had an argument and that Bien "got hostile with [Rispoli]." (Tr. 649–50). At approximately 9:25pm Rispoli paged Daddio on her beeper. (Tr. 650). When Daddio returned her call, Rispoli was frantic and asked her to come over. (Tr. 650–51). Daddio testified that she advised Rispoli to leave the house and call the police. (Tr. 652). Rispoli asked Daddio to come over. (Tr. 652). On the way to Rispoli's home, Daddio stopped to pick up a friend. (Tr. 653).

Daddio arrived at Rispoli's home at approximately 10pm and Nicole ran out of the house into the driveway with Rispoli's granddaughter. (Tr. 653–54). Nicole told Daddio that Bien hurt her mother, and that she believed she was dead. (Tr. 659–60). When Daddio entered the house, she observed Rispoli lying on the floor with a neighbor leaning over her. (Tr. 656). She also observed Bien, who looked down at the table and picked up an iced tea. (Tr. 661). Daddio noticed that Bien's hand was cut and that he had blood all over him. (Tr. 661). Daddio testified that when she saw Bien "he looked like somebody that just came down from a rage." (Tr. 662). Bien exited the residence and Daddio realized that her car was blocking his, so she went outside to move her car. (Tr. 663). After she moved her car, Bien pulled his car off the driveway and drove away. (Tr. 664).

Daddio testified that when she observed Bien in the kitchen and walking to his car he did not stumble or fall, or require assistance to stand up. (Tr. 665). Bien did not hit anything with his vehicle after pulling away from the residence and there was nothing unusual about the way that he operated his vehicle. (Tr. 665, 669).

e.)     Testimony of James Accardi

Police Officer James Accardi testified that he had been a Suffolk County Police Officer for seven years, assigned to the Highway Patrol Unit. (Tr. 684). At approximately 7:18am on the morning of June 7, 1998, he responded to the Brookhaven Memorial Hospital because a patient fit the description of the suspect involved in Janet Rispoli's death. (Tr. 685). Upon identifying the patient as Stephen Bien, Officer Accardi placed him under arrest. (Tr. 688–89). Upon frisking Bien at the hospital, Officer Accardi discovered that he had an engagement ring on his person. (Tr. 691–92).

On cross-examination, Officer Accardi testified that Bien winced when Officer Accardi pulled a sheet back from Bien's injured hand. (Tr. 696). In addition, Officer Accardi testified that Bien did not appear to be intoxicated while at the hospital; he did not smell of alcohol; and he was able to walk on his own. (Tr. 702).

f.)     Testimony of Joseph Pfeffer

Detective Joseph Pfeffer of the Suffolk County Homicide Squad went to the residence on June 7, 2006. He observed a kitchen knife on the sink in the bathroom and a box cutter on the floor that had a broken blade. (Tr. 708). Detective Pfeffer

interviewed witnesses at the residence and then interviewed Bien at the Brookhaven

Memorial Hospital on June 7, 1998, at approximately 8:10am.  (Tr. 706, 719, 716–20).

Bien stated that he was willing to talk to the police and explained that he had his first

drink in four years after Rispoli told him that she wanted to separate from him.  (Tr.

716).  Bien further stated that they had money problems and that Rispoli had a thirteen

year old daughter who had recently been released from Mather Hospital.  (Tr. 716).

Bien stated that "there was a lot of tension in the house and that Janet just didn't have

any time for him anymore."  (Tr. 716).

Detective Pfeffer testified about what Bien related to him as to the events of

the preceding day:

> [H]e said it was about twelve-thirty p.m. that he was
> sleeping in her daughter's bedroom - that Rispoli just did not want
> him in the same room with [her], that the more he thought about it
> the more depressed he got; that at about five-thirty p.m. he went
> out, he was going to his mother's house, that he bought some
> flowers and they were for Rispoli, that he had gotten his
> engagement ring back and that he wanted to return the ring . . . .

> [H]is next reply was that he just wanted to get numb, so he
> bought a pint of Gorcki vodka and some orange juice and he just
> gonna have one sip but that he then had another and then was
> ashamed that he had been drinking so [he] couldn't go see his
> mother, so he bought another bottle.  I asked him what he did after
> he finished the vodka and he told me that he stopped at a bar called
> The Fireside, in Holbrook, that he was drinking with a friend's
> father . . . .

> I asked him what he did next, he told me that he bought a
> six pack of beer and that he went home; asked him where he
> bought the beer, he told me at a deli called the Maybar Deli, that
> he then was talking to Rispoli outside their house and that she

didn't want him to come into the house drunk, that he was lying on the roof of his car that was in the driveway. I asked him if he ever went into the house and he told me that he remembered fighting with Rispoli in the house, that she was pushing him. I asked him why was she pushing and he said they were fighting in the hallway and she was trying to push him out of the house.

I asked him what she said to him and he said that Rispoli and Nicole were saying to him, 'Steve, please leave, just go outside,' and they said that to him a number of times. My next question to him was, 'Nicole was there?,' and he said, he told me that Nicole had the baby in her arms. . . . 'I guess I went, I got a knife from the kitchen draw[er],' and I said, 'A knife?', and he said, 'Well, maybe it was a box cutter.'

. . . .

Then I asked him what he did then and he told me that he remembered being in the hallway shaking Rispoli by her neck, that he was yelling at Rispoli in the hallway . . . he just remembers kneeling over Rispoli, that Nicole was trying to pull the shirt off his back, and that he remembered seeing blood on Rispoli, and I said, 'Well, where did the blood come from?', and he said, 'I guess I must have stabbed her with the box cutter.'

. . . .

[I asked] him what he did next and he told me, 'Then I left,' and I said 'You just left?' And he said, 'Well, I took a Pepsi, an iced tea, two pork chops in aluminum foil and some clothes and left.'
(Tr. 716–19).

Once the interview was concluded, Detective Pfeffer asked Bien to read the

four pages of notes that the Detective had taken and to initial those pages, which he

did. (Tr. 719–22). Detective Pfeffer testified that Bien appeared coherent and was not

slurred in his speech at that time. (Tr. 715). He understood the questions that were

asked and gave responsive answers.  (Tr. 722).  In addition, on cross-examination, Detective Pfeffer testified that Bien "used the words I guess a lot, or I just don't remember," but never said that he "had a complete blank on what happened the night before."  (Tr. 776–77).

### g.)  Testimony of Robert Doyle

Detective Sergeant Robert Doyle is a team supervisor in the homicide squad and was assigned to investigate the homicide of Janet Rispoli.  (Tr. 909–10). Detective Doyle testified that he interviewed Bien at the Brookhaven Memorial Hospital on June 7, 1998, at about 7:50am, for the purpose of preparing a Prisoner Activity Log.  (Tr. 916).  Detective Doyle asked Bien "if he had any pain or injury and he said, yes, his hand hurt."  (Tr. 917).  The Detective testified that he found Bien's emotional condition to be calm.  (Tr. 917).  Detective Doyle further testified that through interview of witnesses, he learned that after the assault was over, Rispoli regained consciousness and Nicole helped her to the bed.  (Tr. 937).

### h.)  Testimony of Gwen Harleman

Dr. Gwen Harleman was a deputy medical examiner in the Suffolk County Medical Examiner's Office.  (Tr. 974).  Dr. Harleman performed an autopsy on Janet Rispoli on June 7, 1998.  (Tr. 978).  Dr. Harleman stated that Rispoli's injuries consisted of "sharp force injuries, which means stab wounds, and incised injuries, and also some blunt injuries."  (Tr. 980).  Rispoli had a broken bone located in "the thyroid cartridge (sic)," where the Adam's apple is located.  (Tr. 981).

15

Dr. Harleman explained that "[s]harp force injury includes stab wounds, meaning an injury that's really deeper inside than it is on the surface, and an incised wound, which means an injury also caused by a sharp instrument but something more superficial across the skin, longer on the surface than it is deep." (Tr. 985). Dr. Harleman testified that Rispoli had sharp very superficial incised injuries on the left cheek and under the lip on the left. (Tr. 985). A stab wound was present over the right collarbone and on the right side of the neck. (Tr. 985).

Dr. Harleman testified that the stab wound over Rispoli's right collarbone was approximately two inches deep and punctured her jugular vein. (Tr. 988). Dr. Harleman stated that such a wound would have caused a considerable amount of bleeding. The stab wound to Rispoli's neck was about an inch and a half long and was approximately three and one half inches deep. This stab did not hit an major blood vessels or bones. (Tr. 988–89).

Dr. Harleman also stated that there was a stab wound and some incised injuries to the left arm. (Tr. 990). In addition, there was a contusion on the left arm and abrasion on the left wrist and some injuries to the left hand. (Tr. 992). There was also "sharp force injury to the right hand" and a three quarter inch cut on the right thumb. (Tr. 993–94). The breasts had bruising and small stab injury and contusions and bruising were present on the legs. (Tr. 995–97). In all, Dr. Harleman found that there were "fifteen plus" stab wounds, with three main stab wounds. (Tr. 1008).

Dr. Harleman testified that the injuries on Rispoli's fingers and hands were

consistent with "warding off a knife" and were "defensive injuries." (Tr. 995, 1012).

Dr. Harleman found that the cause of death was "sharp force injuries, that's including

the stabs and the incised injuries and neck compression" and was "a combination of

all of these things." (Tr. 1000–01).

On cross-examination, Dr. Harleman testified that the sharp force injuries

would contribute to death by loss of blood and the neck compression would contribute

by causing a loss of oxygen and nutrients to the brain and possibly airway

compression. (Tr. 1005).

i.) Testimony Alan Reichman

Dr. Alan Reichman is a forensic psychiatrist and testified as a rebuttal witness

for the government following the testimony of a defense psychologist and a

toxicologist. (Tr. 1560). Dr. Reichman evaluated Bien on June 7, 1999. (Tr.

1565–67). Dr. Reichman explained that an alcohol blackout "occurs when the blood

level of alcohol is rising rapidly, and the typical time frame that is generally

considered to be that within which a blackout occurs is somewhere in the vicinity of

ten or fifteen, twenty minutes." (Tr. 1569–70). Dr. Reichman testified that "even

assuming [Bien's] description of his alcohol intake to be correct . . . assuming he had

two pints within a period of an hour and there was a . . . three to four hour gap

between that time and the crime, I don't see how the alcohol could have played any

role in the commission of this crime other than to cause him to be less inhibited. I

don't see how it could have obliterated his intent, even if he were in a state of alcoholic blackout, which I think is highly unlikely."  (Tr. 1576–77).

On cross-examination, the defense asked whether Dr. Reichman believed that Bien was under an extreme emotional disturbance.  Dr. Reichman stated: "He was tranquilized by the alcohol.  He said he felt much better, so after he drank the alcohol he was not extremely emotionally disturbed anymore, if, indeed, he was to begin with."  (Tr. 1605).

The Defense again asked "during this incident, the altercation, the fight, whatever you want to call it, was he in a state of extreme emotional disturbance?"  (Tr. 1607).  Dr. Reichman stated that he could not answer because Bien "told me that he didn't remember, doing it, so I don't – he didn't give me any information as to what his emotional state was when this occurred."  (Tr. 1607).

2.      Pertinent Portions of the Defense's Case

a.)      Testimony of Mark Staff

Dr. Mark Staff is a physician specializing in forensic medicine and pathology.  (Tr. 1040).  He examined Stephen Bien on October 16, 1998 and opined that the injury on his left hand was "consistent with some type . . . produced by a cutting injury, a cutting object."  (Tr. 1047).  Dr. Staff opined that at the time the injury was sustained, it would not have affected Bien's ability to grip a weapon.  (Tr. 1048).  In addition, Dr. Staff testified that the injury to Bien's hand could have been either an offensive or defensive injury.  (Tr. 1062).

Dr. Staff also reviewed the autopsy photos, report, and other tests performed on Rispoli and found that Rispoli "died as a result of multiple stab and cutting injuries of her neck, torso and upper extremities which were associated with internal organ lacerations, specifically the right jugular vein was the blood vessel that was most severely damaged, and of course, bleeding related to the stab wounds. Another significant autopsy finding contributing to Janet Rispoli Shaffer's (sic) death was the presence of an asphyxia due to some kind of neck compression." (Tr. 1064–65). Finally, Dr. Staff testified that the injury to Rispoli's neck, with involvement of her jugular vein "by far and away was the most important injury leading to her death." (Tr. 1074).

### b.) Testimony of Stephen Bien

Stephen Bien testified on his own behalf. When asked if he killed Rispoli, Bien responded "I guess so. I don't remember. . . . I was in a blackout." (Tr. 1093). Bien testified that he was thirty-five years old and had been an alcoholic for fifteen or sixteen years. (Tr. 1093). Bien testified that he was formerly in the military and was disciplined for drinking while in service. (Tr. 1094–96). He stated that during his time in the Navy he would occasionally blackout while drinking and not recall his conduct the following day. (Tr. 1103).

After leaving the Navy, Bien was married for seven years. Bien testified that he would hide his drinking from his wife. (Tr. 1105–08). Bien stated that during his marriage, he experienced four or five alcohol blackouts, where he would wake up and

find out that he had done things that he had no recollection of. (Tr. 1108). Some of the things he could not remember involved physical abuse of his wife, including one incident where he chased her around the house with a knife. (Tr. 1109).

After an arrest for driving while intoxicated ("DWI") in 1992, Bien started to attend AA meetings. (Tr. 1111). After twice slipping from sobriety, Stephan attempted suicide in 1994 by ingesting vodka and sleeping pills. (Tr (1112–13). After that attempt, Bien testified that he did not have another drink until June 6, 1998, the day of Rispoli's death. (Tr. 1115).

Bien and Rispoli met when she came to speak at his AA group. (Tr. 1116). They met again approximately two weeks later at an AA social event. (Tr. 1117). The pair started dating around Memorial Day weekend of 1997. (Tr. 1118). In November of 1997, Bien and Rispoli moved in together, along with Rispoli's thirteen year-old daughter, Nicole. (Tr. 1120). Some time after that, Rispoli's older daughter, Marie moved in with her young child. (Tr. 1129).

Bien testified to one argument that the couple had while living together. He stated that they both tried to quit smoking because Marie's child was now living in the house and, both feeling on edge, they began to argue about money. (Tr. 1129). Rispoli accused Bien of hiding money from her and he testified that she was "getting really heated up." (Tr. 1129). He held a glass of water over her, in a way that would tell her to cool down. (Tr. 1129). Bien stated that Rispoli must have thought that he was going to hit her because she became very defensive and began to kick him away.

(Tr. 1129).  Bien testified that no other incidents like this followed and he never physically abused Rispoli.  (Tr. 1131).

In April of 1998, Bien proposed to Rispoli and gave her an engagement ring. (Tr. 1144–45 ).  He testified that at that time, their relationship was "very good." (Tr. 1145).  However, Rispoli's children began to demand more and more of her time.  (Tr. 1145).  In May, Nicole was hospitalized and returned home in late May.  (Tr.)  Bien testified that after Nicole returned home, the mood in the house was "tense" and he felt like he "was walking on egg shells."  (Tr. 1151).

On June 5, 1998, about one week after Nicole was released from the hospital, Rispoli told Bien that she believed they should "separate."  (Tr. 1152).  When Bien asked her why she felt that way, she told him that it was something that she had been thinking about.  (Tr. 1153).  Bien stated that he felt "devastated" by this revelation. (Tr. 1152).

The following day was Saturday; Bien went to work in the morning and returned at about  one o'clock in the afternoon.  (Tr. 1154).  Bien tried to talk to Rispoli and told her that he would get an additional job, if that would alleviate their problems.  (Tr. 1154).  Rispoli told him "No" and simply stated that she wanted to break up because "she was confused."  (Tr. 1154).  At about 2pm, Rispoli's friend Terry came over with her children and Bien went to his car to lay down.  (Tr. 1155).

Bien had made plans to go to his mother's home that evening, to celebrate his grandmother's birthday.  (Tr. 1156).  When he asked Rispoli if she would still attend,

she declined and said that "she didn't want to put up a ruse." (Tr. 1157). Bien stated that he told Rispoli "If you don't go this is gonna make me look bad." (Tr. 1157). Bien then asked Rispoli to return the engagement ring he had given her, and after some hesitation, she did. (Tr. 1158). He asked her if she was sure that she didn't want to wear it anymore. (Tr. 1158–59).

After leaving their home, Bien was driving to his mother's house, when he decided that he did not want to feel the pain he was experiencing and he "wanted to get numb." (Tr. 1160). Bien testified that "emotionally it was bad. My stomach was in knots and I had a pounding headache and I didn't know what to do." (Tr. 1160). Bien stated that he went to CVS and bought some orange juice, he then walked a few stores down and bought a pint of vodka. (Tr. 1161). At that time, he thought he would just have the one pint. (Tr. 1162). Bien drove to the East Islip High School and sat in the parking lot while he drank. (Tr. 1162). Bien drank the entire pint of vodka, but did not feel intoxicated and did not feel any better. (Tr. 1166).

Instead of going to his mother's house at that time, Bien bought another pint of vodka and drank the entire bottle while driving around. (Tr. 1167–68). At that point, Bien testified, he began to feel numb. (Tr. 1169). Bien then went to a local bar where he ran into a friend's father. (Tr. 1170). Bien testified that the last thing he recalls about that evening was having a beer with his friend's father because at that point, he slipped into an alcohol blackout. (Tr. 1172).

The next thing that Bien recalled was waking up in the front seat of his car the

following morning. (Tr. 1172). He had a pair of boxer shorts wrapped around his hand because he had gotten cut. (Tr. 1173). He stated that he realized he needed a detox and drove himself to the Talbot House (Tr. 1174). When he arrived, he was brought to the hospital by Talbot House personnel. (Tr. 1178–79). Bien testified that when he was questioned by Detective Pfeffer at the hospital, he was "very confused. I didn't know what was going on, what I was being questioned for." (Tr. 1186). Bien testified that while Detective Pfeffer was questioning him, the Detective was suggesting the pattern of events that occurred and Bien would respond only "I guess so." (Tr. 1187, 1210). Bien testified that the signed the written statement only because he wanted his hand looked at by the medical staff. (Tr. 1189, 1217–18).

### c.) Testimony of Eric Hansen

Eric Hansen testified that he was at the Fireside Inn on the evening of June 6, 1998. (Tr. 1263). He testified that Bien entered the bar at about 8:55pm and left at approximately 9:45pm. (Tr. 1264, 1266). Hansen testified that Bien told him that he had just broken up with his girlfriend and he was going to their house to pick up some clothes. (Tr. 1266). Hansen stated that while they were conversing, he got the impression that Bien had been "drinking a few." (Tr. 1264). Hansen did not recall how much Bien drank while at the bar. (Tr. 1266).

On cross-examination, Hansen stated that the bartender did not refuse to serve Bien, no one told Bien that he should not be driving, and he appeared coherent

throughout their conversation.  In addition, Bien did not pass out, fall asleep at the bar, walk into walls, or fall down.  (Tr. 1269–70).

### d.) Testimony of Jaime Greene

Dr. Jaime Green is a forensic psychologist who examined Bien for six hours at the Suffolk jail in March of 1999, obtaining background information and performing psychological tests.  (Tr. 1298, 1379).  Dr. Greene testified that "a blackout is an amnesia for events that occur during a period of time, generally following extensive alcohol use, generally after alcohol is consumed quickly."  (Tr. 1302–03).  Further, Dr. Greene stated: "What is very interesting, though, about a blackout is that procedural memory is intact and that is the kind of memory that we have in terms of learned behavior that we are so used to doing, that it's almost as though we can do it automatically."  (Tr. 1305).

However, Dr. Greene testified that "one of the difficulties in addressing the issue of blackout, that it is based on self-reporting.  So with a reasonable degree of psychological certainty I cannot say that he was, for sure, in a blackout.  There is information that's consistent with him being in a blackout."  (Tr. 1326).  Further, Dr. Green stated that Bien could not have formed the intent to kill "if because of the intoxication he was really not functioning in a sound, cognitive way."  (Tr. 1322–23).  With respect to the circumstances of Rispoli's death, Dr. Greene testified that "multiple stab wounds could be or could not be indicative of an intent to kill.  I mean, as I understand the wounds, there were more superficial wounds which appear to me

to be more an act of lashing out in rage rather than a goal directed behavior designed to specifically kill someone." (Tr. 1323).

On cross-examination, Dr. Greene testified that psychological testing on Bien indicated that he appeared "to be immature, aggressive, moody, rebellious and he has serious problems controlling his impulses and his temper." (Tr. 1338). Further, Dr. Greene conceded that her opinion that Bien was intoxicated when he attacked Rispoli was based solely on Bien's report of what he drank that night. (Tr. 1355–56).

The prosecutor read portions of Robert Phillips' testimony and Monica Baran's testimony regarding what they heard transpire on the evening of June 6, 1998, including Bien's statement "You like chaos?". (Tr. 1381–84). After having been supplied with this additional information, which Dr. Greene had not before heard, she testified that "it appears that [Bien] had more behavioral control that I had been believed (sic) to think he had. There was still a level of intoxication that I believe he had. Whether he was able to form the intent to kill, you know, I may change my opinion on that." (Tr. 1386). Further, Dr. Greene stated that given the additional information presented, she believed that "he would have the intent to kill." (Tr. 1387). Finally, Dr. Greene stated: "Did he mean to kill her? Perhaps." (Tr. 1391).

On re-direct examination, the defense asked Dr. Greene what her opinion was as to whether Bien was acting under extreme emotional disturbance. (Tr. 1395). The prosecutor objected to the admission of evidence regarding such a defense because no statutory notice of an extreme emotional disturbance defense was provided in the

defense's notice pursuant to N.Y. CPL 250.10. (Tr. 1396). In addition, Dr. Greene had not evaluate Bien for extreme emotional disturbance. (Tr. 1397). Finally, the prosecutor stated that no foundation for an extreme emotional disturbance defense had been laid. (Tr. 1397). The defense argued that based on the testimony that Bien was very distraught over the breakup and the ensuing argument with Rispoli, there was evidence in the record to support an extreme emotional disturbance defense. (Tr. 1397–98). The court denied the defense's application to question Dr. Green regarding extreme emotional disturbance, stating: "I believe it's a little late at this time . . . ." (Tr. 1398).

### e.) Testimony of Oliver Brown

Oliver Brown testified that he is a professor of pharmacology at SUNY Syracuse and he was qualified as an expert in pharmacology and toxicology. (Tr. 1422–23, 27–28). Dr. Brown testified that in his opinion, based on the amount of alcohol that Bien purported to consume on June 6, 1998, his blood alcohol content at the time of the attack was 0.40%. (Tr. 1430–31). Dr. Brown stated that if someone were a seasoned drinker, they could physically function with such a blood alcohol content. (Tr. 1450).

On cross-examination, Dr. Brown testified that a person could recall portions of what occurred at the time of the alleged blackout and still be considered in a "fragmentary blackout." (Tr. 1464). Dr. Brown further testified that the time over which a quantity of alcohol was imbibed and food consumption are factors to be

considered in blood alcohol content and he was not aware of what, if anything, Bien had eaten that day. (Tr. 1467–68).

### 3. The Jury Charge and Verdict

The trial court found that no reasonable view of the evidence supported submission of a lesser included offense to the jury, and thus, denied the Petitioner's request to charge manslaughter. (Tr. 1530–31). Concerning the affirmative defense of extreme emotional disturbance, the Court found that the evidence regarding Bien's argument with Rispoli and his alcohol ingestion was insufficient to warrant a charge of extreme emotional disturbance. (Tr. 1531).

The court charged the jury on two counts of the crime of murder in second degree under the theories of intentional murder (count one) and depraved indifference (count two). The court explained to the jury that the defendant could be found guilty on count one or count two, but not on both. (Tr. 1755). In addition, the court charged the jury that intoxication may be considered in determining whether or not Bien possessed the requisite intent, an essential element of the crime charged. (Tr. 1753). The court elaborated: "If, therefore, in this case, after considering all of the evidence bearing upon the defendant's intoxication you have a reasonable doubt whether the defendant was capable of forming the intent or conscious objective to cause the death of Janet Rispoli, the defendant must be found not guilty of the crime of intentional murder . . . ." (Tr. 1753).

The jury found Bien guilty of count one, intentional murder, and not guilty of

count two, depraved indifference murder.  After conviction, the Petitioner was sentenced to an indeterminate term of 25 years to life imprisonment.

## C.    State Court Review

 On December 22, 1999, the Petitioner moved to set aside the verdict pursuant to N.Y. CPL § 330.40(1), CPL Article 730, and *People v. Francabandera*, 33 N.Y.2d 429, 310 N.E.2d 292, 354 N.Y.S.2d 609 (1974).  After denial of the motion, the Petitioner appealed his conviction to the Appellate Division, Second Department.  On appeal, Bien alleged that the Court improperly failed to charge the jury on manslaughter in the first degree as a lesser-included offense of the charge of murder in the second degree.  In addition, the Petitioner appealed the trial court's denial of his motion to amend his C.P.L. 250.10 notice to include a defense of extreme emotional disturbance and the denial of a jury charge on that defense.  Finally, the Petitioner appealed his sentence as excessive.

The Appellate Division, Second Department, affirmed the Petitioner' conviction.  *People v. Bien*, 1 A.D.3d 442, 766 N.Y.S.2d 895 (2d Dep't 2003).  The court determined that the trial court properly refused to charge the jury on manslaughter as a lesser included offense of murder because "[t]here was no reasonable view of the evidence to support a finding that the defendant only intended to inflict serious physical injury on the victim."  *Id.*  In addition, the court summarily found that the trial court properly refused to allow the defendant to amend his CPL 250.10 notice to include an extreme emotional disturbance defense.  *Id.*  The New

York Court of Appeals denied leave to appeal, *People v. Bien*, 1 N.Y.3d 624, 808 N.E.2d 1282, 777 N.Y.S.2d 23 (2004).

The Petitioner also filed for a writ of error coram nobis on the ground of ineffective assistance of appellate counsel. The Appellate Division, Second Department denied that application, finding that the Petitioner "failed to establish that he was denied the effective assistance of appellate counsel." *People v. Bien*, 12 A.D.3d 615, 784 N.Y.S.2d 376 (2d Dep't 2004). The New York Court of Appeals again denied leave to appeal. *People v. Bien*, 4 N.Y.3d 796, 828 N.E.2d 88, 795 N.Y.S.2d 172 (2005).

## II.  DISCUSSION

### A.     Standards of Review

The Antiterrorism and Effective Death Penalty Act (the "AEDPA") provides that a federal court may grant habeas relief to state prisoners with respect to any claim that was adjudicated on the merits in state court proceedings only if the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005)

(discussing the federal habeas review standard set forth in Section 2254). It is well-settled that a state court's findings of fact are entitled to a "presumption of correctness" that the petitioner in question must rebut by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

"A state-court decision is 'contrary' to clearly established federal law within the meaning of § 2254(d)(1) if it is 'diametrically different' from, 'opposite in character or nature' to, or 'mutually opposed' to the relevant Supreme Court precedent." *Henry v. Poole*, 409 F.3d 48, 68 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)) (internal quotation marks omitted). "A state court decision involves 'an unreasonable application' of clearly established Federal law if the state court applies Federal law to the facts of the case in an objectively unreasonable manner." *Brisco v. Phillips*, 376 F. Supp. 2d 306, 311 (E.D.N.Y. 2005); *see also Brown v. Payton*, 544 U.S. 133, 125 S. Ct. 1432, 1439, 161 L. Ed. 2d 334 (2005) (citing *Williams*, 529 U.S. at 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389); *Serrano v. Fischer*, 412 F.3d 292, 296 (2d Cir. 2005) (citations omitted). "[I]it is well-established in [this] Circuit that the 'objectively unreasonable' standard of § 2254(d)(1) means that [a] petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." *Rosa v. McCray*, 396 F.3d 210, 219 (2d Cir. 2005) (citing *Cotto v. Herbert*, 331 F.3d 217, 248 (2d Cir. 2003)).

Under the AEDPA, a court does not decide "whether the state court correctly interpreted the doctrine of federal law on which the claim is predicated, but rather whether the state court's interpretation was unreasonable in light of the holdings of the United States Supreme Court at the time." *Brown v. Greiner*, 409 F.3d 523, 533 (2d Cir. 2005); *see also Williams*, 529 U.S. at 405, 120 S. Ct. at 1495.

It is well-settled that "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990)). In this regard, the United States Supreme Court has indicated that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *See Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991). On the contrary, "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68, 112 S. Ct. 475 (citations omitted).

**B.     As to the Trial Court's Refusal to Charge the Jury On Manslaughter in the First Degree**

The Petitioner contends that the trial court's refusal to charge Manslaughter in the First Degree as a lesser included offense of murder and the Appellate Division's failure to correct this error amounted to an unreasonable application of Federal law. Specifically, the Petitioner contends that the evidence, when viewed in a light most favorable to him, could reasonably support the view that he intended to cause Rispoli serious physical injury, but not to cause her death.

This issue, however, cannot form the basis for habeas relief. *See Maldonado v. West*, No. 05CV3132, 2007 WL 188684, at \*6 (E.D.N.Y. Jan. 22, 2007) (finding that a failure to charge lesser included offenses is not subject to habeas review). In *Beck v. Alabama*, the United States Supreme Court found that in capital cases, due process requires a trial court to instruct a jury on lesser-included offenses, if the evidence warrants such a charge. *See Singleton v. Duncan*, No. 03CV0561, 2006 WL 73734, at \*10 (E.D.N.Y. Jan. 10, 2006) (citing *Beck v. Alabama*, 447 U.S. 625, 637–38 (1980)). In *Knapp v. Leonardo*, 46 F.3d 170 (2d Cir. 1995), the Second Circuit noted that "[n]either the Supreme Court nor this circuit has decided whether the failure to instruct the jury on lesser included offenses in non-capital cases is a constitutional issue that may be considered on a habeas petition." *Knapp*, 46 F.3d at 179. Further, in *Jones v. Hoffman*, 86 F.3d 46 (2d Cir. 1996) the Second Circuit held that "[s]ince a decision interpreting the Constitution to require the submission of instructions on lesser-included offenses in non-capital cases would involve the announcement of a new rule," it was precluded from considering the issue in a habeas case. *Jones v. Hoffman*, 86 F.3d at 48. Therefore, in this circuit, habeas review of a state trial court's failure to instruct on lesser included offenses in noncapital cases is precluded. *See Maldonado*, 2007 WL 188684, at \*6.

Further, even if this issue was a proper subject for habeas review, the Court finds that the trial court's failure to submit the lesser-included offense to the jury was not contrary to or an unreasonable application of clearly established federal law or

contrary to any New York rule of law that is consistent with any federal constitutional standard. *See Campaneria v. Reid*, 891 F.2d 1014, 1022–23 (2d Cir. 1989) (stating that the Second Circuit has yet to decide whether due process requires a charge of lesser-included offenses in non-capital cases, but finding that it was not required to reach that question because no reasonable view of the evidence would entitle the defendant to an instruction on second-degree manslaughter); *Maldonado*, 2007 WL 188684, at *6 (citing *House v. Miller*, No. 02CV5379, 2003 WL 23198788, at *16 (E.D.N.Y. Oct. 27, 2003)); *Singleton*, 2006 WL 73734, at *10 (citing 28 U.S.C. § 2254(d)).

N.Y. Penal Law § 125.20 reads, in part:

> A person is guilty of manslaughter in the first degree when: 1. With intent to cause serious physical injury to another person, he causes death of such person or of a third person; or 2. With intent to cause the death of another person, he caused the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance .
> . . .

N.Y. Penal Law § 125.20 (McKinney 2004). Further, N.Y. Criminal Procedure Law § 300.50(1) provides that a trial court may:

> submit in the alternative any lesser included offense if there is a reasonable view of the evidence which would support a finding that the defendant committed such lesser offense but did not commit the greater. If there is no reasonable view of the evidence which would support such a finding, the court may not submit such lesser offense.

N.Y. C.P.L. § 300.50(1) (McKinney 2002).

Here, no reasonable view of the evidence would have supported a finding that the Petitioner intended only to cause Janet Rispoli serious physical injury. The medical examiner testified that the Petitioner stabbed Rispoli fifteen times, twice in the neck at depths of two inches and three and one-half inches, respectively. (Tr. 988–89). Furthermore, the Petitioner choked Rispoli with sufficient force to cause a broken bone in the thyroid region. (Tr. 981). On any reasonable view of the evidence, the Petitioner was not entitled to the lesser-include charge of first-degree manslaughter based upon an intent to cause serious physical injury. *See Rodriguez v. Smith*, 485 F. Supp. 2d 368, 382 (S.D.N.Y. 2007) (finding no reasonable view of the evidence supported a finding that the defendant intended only serious injury where the defendant strangled the victim, hit her over the head with a ceramic toilet cover, and then stabbed her in the neck with a shard of the broken cover).

**C.      As to the Trial Court's Refusal to Allow In Evidence and Charge the Jury on the Subject of Extreme Emotional Disturbance**

The Petitioner alleges that he was deprived the right to present a complete defense because the trial court refused to allow the defense psychologist, Dr. Jaime Greene, to render her opinion on whether the petitioner was acting under an extreme emotional disturbance at the time of Rispoli's death. In addition, the Petitioner alleges that the trial court erred when it refused to charge the jury regarding the affirmative defense of extreme emotional disturbance.

In preparing for trial, the Petitioner's defense counsel submitted a Notice of Intent, pursuant to N.Y C.P.L. § 250.10(2) (the "250.10 Notice"), which stated in full "the above defendant intends to offer psychiatric and other evidence of mental disease or defect in connection with the affirmative defense of lack of criminal responsibility by reason of mental disease or defect." The statement made no mention of an intent to offer psychiatric evidence regarding a defense of extreme emotional disturbance.

During the testimony of Dr. Jaime Greene, the defense asked for her opinion on whether Bien was acting under extreme emotional disturbance. (Tr. 1395). At sidebar, the prosecutor objected to the admission of evidence regarding such a defense because no statutory notice of an extreme emotional disturbance defense was provided in the defense's 250.10 Notice. (Tr. 1396). In addition, the prosecutor argued that Dr. Greene had not evaluated Bien for extreme emotional disturbance and no foundation for an extreme emotional disturbance defense had been laid. (Tr. 1397). The defense sought permission to amend its 250.10 Notice. The defense argued that based on the testimony that Bien was very distraught over the breakup and the ensuing argument with Rispoli, there was evidence in the record to support an extreme emotional disturbance defense. (Tr. 1397–98). The court denied the defense's application to question Dr. Green regarding extreme emotional disturbance, stating: "I believe it's a little late at this time . . . ." (Tr. 1398).

During the cross-examination of the prosecution's rebuttal witness, Dr. Alan Reichman, the defense asked whether Dr. Reichman believed that Bien was acting

under an extreme emotional disturbance.   The prosecutor again objected to the

question.  (Tr. 1605).   However, Dr. Reichman stated: "He was tranquilized by the

alcohol.  He said he felt much better, so after he drank the alcohol he was not

extremely emotionally disturbed anymore, if, indeed, he was to begin with."  (Tr.

1605).  When asked again, Dr. Reichman stated that he could not render an opinion

because the Petitioner did not remember the incident, so there was no information as

to his emotional state at the time of the incident.  (Tr. 1607–09).

New York Penal Law § 125.25 provides that a person is guilty of murder in the

second degree when:

> 1. With intent to cause the death of another person, he
> causes the death of such person or of a third person; except that in
> any prosecution under this subdivision, it is an affirmative
> defense that:  (a) The defendant acted under the influence of
> extreme emotional disturbance for which there was a reasonable
> explanation or excuse, the reasonableness of which is to be
> determined from the viewpoint of a person in the defendant's
> situation under the circumstances as the defendant believed them
> to be. Nothing contained in this paragraph shall constitute a
> defense to a prosecution for, or preclude a conviction of,
> manslaughter in the first degree or any other crime . . . .

New York Penal Law § 125.25 (McKinney 2004).  New York law

requires the defense to furnish timely notice of its intent to present

psychiatric testimony with regard to certain defenses:

> Psychiatric evidence is not admissible upon a trial unless
> the defendant serves upon the people and files with the court a
> written notice of his intention to present psychiatric evidence.
> Such notice must be served and filed before trial and not more
> than thirty days after entry of the plea of not guilty to the

indictment.  In the interest of justice and for good cause shown,
however, the court may permit such service and filing to be made
at any later time prior to the close of the evidence.

N.Y. C.P.L. § 250.10(2) (McKinney 2002).  The notice statute recognizes three

separate defense categories that require the defendant to submit a notice:

> (a) Evidence of mental disease or defect to be offered by the
> defendant in connection with the affirmative defense of lack of
> criminal responsibility by reason of mental disease or defect.
> (b) Evidence of mental disease or defect to be offered by the
> defendant in connection with the affirmative defense of extreme
> emotional disturbance as defined in paragraph (a) of subdivision
> one of section 125.25 of the penal law and paragraph (a) of
> subdivision two of section 125.27 of the penal law.
> (c) Evidence of mental disease or defect to be offered by the
> defendant in connection with any other defense not specified in the
> preceding paragraphs.

N.Y. C.P.L. § 250.10(1) (McKinney 2002).  "Upon receiving notice of defendant's

intent to present psychiatric evidence, the prosecutor may apply for an order directing

defendant to be examined by a licensed psychologist or psychiatrist designated by the

prosecutor. . . .  If a defendant refuses to cooperate with the court-ordered

examination, he is prohibited from introducing evidence from a psychiatrist or

psychologist during his trial."  *Cortijo v. Bennet*, No. 05CV8044, 2006 WL 3057285,

at *8 n.8 (S.D.N.Y. Oct. 26, 2006) (internal citations omitted).  Here, the defendant's

250.10 Notice furnished notice only of its intent to adduce evidence with respect to the

affirmative defense of lack of criminal responsibility by reason of mental disease or

defect.

The Supreme Court has held that a trial court may preclude evidence as a sanction for violating a state discovery rule. *See Taylor v. Illinois*, 484 U.S. 400, 414, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (upholding an order excluding the testimony of a defense witness as a sanction for defense counsel's noncompliance with a discovery rule that required notice of intention to call the witness, and for misleading the court concerning his knowledge of the witness's whereabouts); *Romano v. Zon*, No. 04CV2467, 2007 WL 2693664, at *6 (E.D.N.Y. Sept. 10, 2007). While the Court confirmed that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense," it found that this right must be balanced against the state's interest in an orderly trial. *Taylor*, 484 U.S. at 408, 108 S. Ct. 646, 98 L. Ed. 2d 798. "Because precluding evidence as a sanction for failure to give notice implicates a defendant's Sixth and Fourteenth Amendment rights, a trial court deciding whether to bar psychiatric testimony must balance 'a defendant's constitutional right to present witnesses in his own defense' against 'prejudice to the People from the belated notice.'" *Romano*, 2007 WL 2693664, at *6 (quoting *People v. Berk*, 88 N.Y.2d 257, 266, 644 N.Y.S.2d 658, 667 N.E.2d 308 (1996)); *Rios v. Artuz*, 07CV0330, 2007 WL 1958899, at *6 (E.D.N.Y. June 29, 2007).

The New York Court of Appeals has held that the trial court has "broad discretion in making evidentiary rulings in connection with the preclusion or admission of testimony and such rulings should not be disturbed absent an abuse of discretion." *People v. Almonor*, 93 N.Y.2d 571, 583, 693 N.Y.S.2d 861 (1999). In

*Almonar*, the Court stated that the notice requirement "is designed to create a format by which psychiatric evidence may be prepared and presented manageably and efficiently, eliminating the element of surprise. With that in mind the Legislature has formulated a procedure that depends upon proper notification, adversarial examination, and preclusion when appropriate." *Id.* at 578, 693 N.Y.S.2d 861. In addition, the Court noted that "[t]he statute is not cast so as to allow a defense or affirmative defense to be introduced when notice is given; it is cast in terms that bar the defense unless notice is given." *Id.* at 581, 693 N.Y.S.2d 861.

In this case, the defense gave no indication that it would pursue an extreme emotional disturbance defense until late into the trial. The defense did not seek to adduce evidence relating to extreme emotional disturbance until re-direct examination of Dr. Greene, after the People had already rested their case. In addition, the prosecution did not have prior notice that Dr. Greene evaluated the Petitioner for extreme emotional disturbance, and, therefore lost the important opportunity to request its own psychiatric examination on this subject.

The trial court's exclusion of Dr. Greene's testimony on the topic of extreme emotional disturbance at the late stage of the trial was an appropriate exercise of discretion in balancing the Petitioner's right to present witnesses in his own defense against the prejudice to the People stemming from late notice and the state's interest in an orderly trial. The Petitioner has failed to show that the trial court's exclusion of evidence on the topic of extreme emotional disturbance amounted to an unreasonable

application of federal law.  *See Rios*, 2007 WL 1958899, at *6 (denying **a** habeas

claim based on exclusion of psychiatric evidence where the defense knew of medical

records and psychiatric opinion "for some time" and failed to show good cause why he

did not file a notice to admit such evidence).

Furthermore, the trial court did not err in declining to instruct the jury on the

issue of extreme emotional disturbance.  Generally, state jury charges are questions of

state law and not a proper subject for review on a petition for writ of habeas corpus

absent a showing that a jury charge deprived the Petitioner of a federal constitutional

right.  *Medina v. Greene*, No. 03CV8646, 2004 WL 2809196, at *6 (S.D.N.Y. Dec. 7,

2004) (citing *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir.1990)).  Importantly,

"[d]ue process does not require the giving of a jury instruction when such charge is

not supported by the evidence."  *Blazic*, 900 F.2d at 541.

Under New York law, there are two elements to the affirmative defense of

extreme emotional disturbance:

> [A] defendant must demonstrate, first, that he or she acted under
> the influence of an extreme emotional disturbance and, second,
> that there was a reasonable explanation or excuse for that
> disturbance. The first, subjective element is met if there is
> evidence that defendant's conduct at the time of the incident was
> actually influenced by an extreme emotional disturbance. The
> second is an objective element and requires proof that defendant's
> emotional disturbance was supported by a reasonable explanation
> or excuse. This is determined by viewing the subjective mental
> condition of the defendant and the external circumstances as the
> defendant perceived them to be at the time, however inaccurate
> that perception may have been, and assessing from that standpoint

> whether the explanation or excuse for the emotional disturbance was reasonable.

*People v. Roche*, 98 N.Y.2d 70, 745 N.Y.S.2d 775, 772 N.E.2d 1133, 1138 (2002) (citations omitted).

With respect to the subjective element, based on the evidence presented, the defense could not establish that the Petitioner's actions were actually influenced by an extreme emotional disturbance. The Petitioner testified that he did not recall the events on the evening of Rispoli's death, and therefore did not testify to his state of mind during the attack. Upon questioning by the defense on the issue of extreme emotional disturbance, Dr. Reichman testified that without the Petitioner's account of the events or his emotional state at the time, he could not render an opinion as to whether the Petitioner was acting under an extreme emotional disturbance. (Tr. 1607).

Further, on cross-examination, the prosecutor supplied the defense expert Dr. Jaime Greene with portions of testimony from Robert Phillips and Monica Baran. In hearing the additional evidence, Dr. Greene stated that she might change her earlier opinion that Bien did not form the intent to kill Rispoli during the attack. (Tr. 1386). Dr. Greene testified that in light of the additional information, she believed that "[Bien] would have the intent to kill." (Tr. 1387). Finally, Dr. Greene stated: "Did he mean to kill her? Perhaps." (Tr. 1391).

In addition, in deciding whether a person has acted out of an extreme emotional disturbance, or a loss of self-control, courts consider the individual's conduct before and after the homicide. *See Roche,* 98 N.Y.2d at 77, 772 N.E.2d 1133,

745 N.Y.S.2d 775; *People v. Dominguez*, 640 N.Y.S.2d 583, 583-84; 226 A.D.2d 391, (2d Dep't 1996); *People v. Han*, 200 A.D.2d 780, 782, 607 N.Y.S.2d 365 (2d Dep't 1994) (finding that "the defendant's actions in donning gloves as he repeatedly stabbed his two victims, his taking the murder weapon with him and disposing of it, his presence of mind to drive to his girlfriend's place of employment, his request that she travel to California with him, his purchase of airline tickets using an alias, and his purposeful act of not returning to his home after his crimes" to be inconsistent with a loss of control). Here, prior to his attack on Rispoli, the Petitioner had a calm discussion with Eric Hansen at a local pub, and told him that he was going home to gather some belongings, drove to Rispoli's home and waited for her return. Following the attack, without acting to aid Rispoli, the Petitioner told Robert Phillips that he needed to get a shirt, and gathered clean clothing, an iced tea, a Pepsi, and two porkchops before leaving the home. These are not the acts of a person experiencing a loss of self-control due to the break-up of a romantic relationship, no matter how turbulent or passionate that relationship may have been.

Furthermore, with respect to the objective element, "a defendant's reaction must be 'an understandable human response deserving of mercy.'" *Shiwlochan v. Portuondo*, 345 F. Supp. 2d 242, 266 (E.D.N.Y. 2004) (quoting *People v. Casassa*, 49 N.Y.2d 668, 680-81, 427 N.Y.S.2d 769, 404 N.E.2d 1310 (1980)). The Petitioner contends that the break up of this "very intense, emotional relationship," whereby he viewed himself as Rispoli's "rescuer, . . . friend, confidant and savior," along with his

need to "numb his pain" evidences that his response was an understandable human reaction to the circumstances as he perceived them at the time. The Court disagrees.

In *Roche*, the Court found that the defendant could not establish an extreme emotional disturbance defense in the homicide of his wife, where they had been arguing most of the day and she sent him on a number of errands on the afternoon of the murder, causing him to climb the stairs to the fifth-floor apartment numerous times. *Roche*, 98 N.Y.2d 70, 78, 772 N.E.2d 1133, 745 N.Y.S.2d 775. In *People v. Berk*, the court found that the defendant, who witnessed his estranged wife engaged in sexual activity with another man, did not have a sufficient basis to raise an extreme emotional disturbance defense. *See People v. Berk*, 217 A.D.2d 941, 943, 629 N.Y.S.2d 588, 590 (4th Dep't 1995). Here, as in *Roche* and *Berk*, the Petitioner's actions were not an understandable human response to Rispoli's desire to break off their relationship.

Furthermore, any claim that the Petitioner's action was "an understandable human response" arising from his argument and break-up with Rispoli was undermined by testimony that the Petitioner had a history of acting violently toward his mother and former wife, and had even chased his former wife with a knife on one occasion. *See Murden v. Artuz*, 497 F.3d 178, 190 (2d Cir. 2007) (affirming the district court's denial of habeas corpus where the district court found no merit in an extreme emotional disturbance defense because, among other things, the defendant's "psychiatric records 'would have revealed the petitioner to the jury as a violently

jealous man, possessed by a kind of homicidal jealousy directed at least [toward] one other person in addition to this victim'").

**D.     As to Denial of an Impartial Forum**

The Petitioner contends that he was denied an impartial forum because "improper comments by the court . . . unquestionably influenced the jury." Specifically, during cross-examination of the Petitioner by the prosecution, the prosecutor asked:  "At what point does your memory fail on the night Rispoli was murdered?" (Tr. 1198).  When the defense objected to the use of the term "murder," the court responded that "she didn't die naturally . . . . It wasn't a natural death, right? We heard from the medical examiner who testified when they conducted the medical examinations.  Overruled.  Continue."  (Tr. 1198).  After the Petitioner was excused from the stand and the jury was excused for the day, the defense moved for **a** mistrial based on this exchange.  (Tr. 1244).  The trial court denied the motion.  (Tr. 1245).

Further, the Petitioner states that the trial judge exhibited this bias at pre-trial hearings by telling defense counsel:  "You should tell your client to start remembering what happened that night."  Finally, the Petitioner states that the bias of the trial court was further evidenced by the court's statement at sentencing that "[the jury] didn't believe you.  The charade should be over."  (Sentencing of Stephen Bien, Jan. 4, 2000, at 19).   For all of these reasons, the Petitioner asserts that the trial resulting in his conviction for murder was fundamentally unfair.

44

The Court notes that federal courts have limited power to review the conduct of a state trial judge. Federal review is limited to "the narrow one of due process and not the broad exercise of supervisory power that we would possess in regard to our own trial court." *Garcia v. Warden, Dannemora Correctional Facility*, 795 F.2d 5, 7–8 (2d Cir. 1986) (quoting *DeChristoforo v. Donnelly*, 473 F.2d 1236, 1238 (1st Cir. 1973)). "A trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent to be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits." *Johnson v. Scully*, 727 F.2d 222, 226 (2d Cir. 1984) (quoting *Daye v. Attorney General*, 712 F.2d 1566, 1572 (2d Cir. 1983)). A mere showing that the judge's remarks were "undesirable" is not sufficient. *Daye*, 712 F.2d at 1572.

In *Johnson*, the Second Circuit found that the trial judge's conduct in questioning witnesses and dwelling heavily on the prosecution's case and evidence while instructing the jury did not raise a constitutional concern. *Johnson*, 727 F.2d 222. The trial court questioned a defendant accused of criminal possession and sale of heroin whether she was "curious at all about what was in the knapsack." *Id.* at 225. In addition, during its charge to the jury, the trial court commented "Do you regard [defendant's] admission that she was being kept by defendant Johnson as an act of moral turpitude? Do decent, normal people carry on that way?" *Id.* at 226. Although finding that these remarks were "troublesome" and stating that a trial judge should

refrain from challenging questioning of the defendant, especially where such questioning "blatantly reflects his own disbelief in the essence of the defense," the Second Circuit found that the trial judge's comments "did not cross the line that permits [a finding] that the Constitution has been violated."  *Id.* at 227 (internal quotations and citations omitted).  Here, the trial judge's response to the prosecutor's question did not exhibit any personal disbelief in the Petitioner's defense, and it falls far short of raising a federal constitutional concern regarding the fairness of the Petitioner's trial.

Moreover, the trial judge issued a curative instruction to the jury at the start of the next trial day, explaining to the jury:

> You recall in my preliminary instructions to the jury I stated that any objections to questions made by respective counsel is not evidence in the case or any statements or arguments or even questions is not evidence in the case.  And further I gave you preliminary instructions here that anything that the Court may say or do during the course of the trial should not be taken by you as indicating what your verdict should be.  So I want to keep that, bear that in mind.  I bring that to your attention once again.
>
> I know many of you have not sat on a jury before so I just want to again make it crystal clear, and there were times when I may have asked a witness a question, so that was only for clarification, Ladies and Gentlemen.  Again, I have no position in this case whatsoever.  The sole and exclusive judges of the facts are you to determine what the evidence is.
>
> Again, I repeat, the evidence is what you hear from the lips of the witnesses that are sworn and the exhibits that the Court allows in.  You do recall exhibits allowed in here both by defense and the prosecution, and any facts that the respective counsels agree to, stipulate to, is evidence in the case, all right?  Okay, thank you very much.

(Tr. 1250–51). "The jury is presumed to obey a court's curative instruction." *Rosario v. Walsh*, 05CV2684, 2006 WL 1431410 at *23 & n.45 (S.D.N.Y. May 25, 2006); *see also United States v. Colombo*, 909 F.2d 711, 715 (2d Cir. 1990) ( "[W]e presume that a jury adheres to the curative instructions of the trial court."). Thus, any questionable remarks made by the trial judge in this case were cured by his clear instruction to the jury.

Finally, the remarks of the trial court outside of the presence of the jury do not even approach the standard required to show an unfair bias infecting the fundamental fairness of the Petitioner's trial. Accordingly, the Petitioner's claim that he was denied an impartial forum is without merit.

## E. As To The Claims of Prosecutorial Misconduct

"The Supreme Court has instructed federal courts reviewing *habeas* petitions premised upon prosecutorial misconduct to distinguish between ordinary trial error of a prosecutor and . . . egregious misconduct . . . amounting to a denial of constitutional due process." *Goines v. Walker*, No. 97CV3512, 2000 WL 976657, at *68 (E.D.N.Y. July 12, 2000) (quoting *Donnelly v. DeChristophoro*, 416 U.S. 637, 647-48, 94 S. Ct. 1868, 1873, 40 L. Ed. 2d 431 (1974)) (internal quotation marks omitted). The Court must determine whether the prosecutor's actions "were so prejudicial that they rendered the trial fundamentally unfair.'" *See Garofolo v. Coomb*, 804 F.2d 201, 206 (2d Cir. 1986) (citation omitted); *United States ex rel. Haynes v. McKendrick*, 481 F.2d 152 (2d Cir. 1973)); *see also Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir.

1998) (quoting *Bentley v. Scully*, 41 F.3d 818, 823 (2d Cir. 1994)) ("To be entitled to relief, [a petitioner] must show 'that he suffered actual prejudice because the prosecutor's comments [at trial] **. . .** had a substantial and injurious effect or influence in determining the jury's verdict.").

The Petitioner contends that the prosecutor made improper comments during summation and sentencing, which so infected the jury with unfairness as to make his conviction a denial of due process. During summation the prosecutor stated that the case was not about who caused Rispoli's death, but was "about excuses, mainly in the form of a large vodka bottle or any other bottle that this defendant has been hiding behind his entire life. . . . This case has never been about a man, and when [I] talk about him I truly use the word man loosely." (Tr. 1688). In addition, the Petitioner alleges that the prosecutor improperly harped on the missing receipt for the purchase of the vodka that the Petitioner testified to having ingested prior to Rispoli's homicide. Finally, the Petitioner states that the prosecutor made derogatory statements during sentencing: "[Bien] is not an individual who is prepared or who has taken responsibility like a man for what he has done. You are an individual who, your whole life, have committed acts and violence against the people around you and have used that alcohol bottle to hide behind." (Sentencing of Bien, Jan. 4, 2000, at 16).

"Generally, issues concerning the propriety of comments made by a prosecutor during summation do not present meritorious federal questions." *Barclay v. Spitzer*, No. 02CV2184, 2003 WL 24053776, at *14 (E.D.N.Y. Sept. 29, 2003)

(citing *United States v. Robinson*, 485 U.S. 25, 99 L. Ed. 2d 23, 108 S. Ct. 864

(1988))*,* vacated in part by *Barclay v. Spitzer*, No. 03CV2758, 2004 WL 3756467, at

*1 (2d Cir. Sept. 23, 2004).  Criminal convictions "[are] not to be lightly overturned

on the basis of a prosecutor's comments standing alone' in an otherwise fair

proceeding."  *Id.* (citing *United States v. Young*, 470 U.S. 1, 11, 84 L. Ed. 2d 1, 105 S.

Ct. 1038 (1985)).  A prosecutor's comments are not "grounds for granting the writ

unless the comments 'so infected the trial with unfairness as to make the resulting

conviction a denial of due process.'"  *Id.* (citing *Donnelly*, 416 U.S. 637, 643, 94 S.

Ct. 1868, 40 L. Ed. 2d 431 (1974)).  Finally, "even if the prosecutor's comments were

improper, they did not affect the certainty of conviction."  *Dumas v. Strange*, No.

00CV0963, 2002 WL  1608280, at *13 (D. Conn. July 3, 2002).

Here, the Court finds that the comments of the prosecutor were not prejudicial

and the Petitioner has not shown that they had a substantial effect on the jury's

verdict, or resulted in actual prejudice to him.  In addition, the prosecutor's comments

at sentencing came after the jury rendered its verdict and, generally**,** cannot be the

basis for habeas review.

Finally, the Petitioner claims that the prosecutor presented an individual as an

expert and then allowed him to offer testimony after admitting that he had no

knowledge and no experience in the area he was testifying about as an expert.  The

Petitioner does not state exactly which witness's testimony he is raising, but the Court

can only assume that this is the testimony of Dr. Alan Reichman, who testified as a

rebuttal expert witness for the prosecution. First, the Court notes that the trial court, within its broad discretion, admitted Dr. Reichman as an expert in the area of forensic psychiatry after he testified that he had been involved in about ten evaluations involving alcohol blackout. (Tr. at 1564–65, 1568–69). Second, the defense had ample opportunity to, and did, cross-examine Dr. Reichman regarding his qualifications and experience with respect to alcohol blackout. (Tr. at 1578–85). Finally, this cross-examination gave the jury an opportunity to weigh the relative credibility of the parties' experts. Thus, the prosecutor's offer of Dr. Reichman's expert testimony was not tantamount to "knowingly presenting false evidence " and the Petitioner has shown no prejudice resulting from his testimony. Accordingly, the Petitioner's prosecutorial misconduct claims are without merit.

**F.     As to the Petitioner's Ineffective Assistance of Counsel Claims**

1.     Ineffective Assistance of Trial Counsel

To establish ineffective assistance of counsel, the petitioner must demonstrate: (1) that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that he was prejudiced by his counsel's deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In applying the above two-prong test, "judicial scrutiny of counsel's performance must be highly deferential" and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S. Ct 2052, 80 L. Ed. 2d 674. The relevant

inquiry focuses "on the fundamental fairness of the proceeding whose results are being challenged." *Id.* at 696, 104 S. Ct. 2052, 80 L. Ed. 2d 674. "The court's central concern is not with 'grading counsel's performance' but with discerning 'whether despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.'" *United States v. Aguirre*, 912 F.2d 555, 560 (2d Cir.1990) (quoting *Strickland*, 466 U.S. at 696-97,104 S. Ct. 2052, 80 L. Ed. 2d 674).

The burden is on the petitioner to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674. Indeed, as the Supreme Court has noted, "there are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.*

With respect to the second prong, the petitioner can only establish actual prejudice if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Billy-Eko v. United States*, 8 F.3d 111, 114 (2d Cir. 1993), abrogated on other grounds by *Massaro v. United States*, 538 U.S. 500, 123 S. Ct. 1690, 155 L. Ed. 2d 714 (2003).

At the trial, the Petitioner was represented by Alan Polsky, Esq. Bien contends that his trial attorney was ineffective for several reasons: (1) he did not question the arresting officer as to why no testing was done to determine the Petitioner's blood

alcohol content and how the officer came to the conclusion that the Petitioner was not intoxicated without the benefit of testing; (2) he did not sufficiently investigate the matter; and (3) he did not object to the "apparent bias of the trial judge and allowed evidence of the character that the jurors could not cast aside when deciding the matter." Here, the petitioner fails to meet either prong of the *Strickland* test.

First, Mr. Polsky did question Detective Pfeffer, in the presence of the jury, regarding the lack of a blood alcohol content test and his conclusion that the Petitioner was not intoxicated on the morning of June 7, 1998:

> Q. Now, during your investigation was there any information you received that the night before that Bien had been drinking?
>
> A. Only from - - well, that's not true. I was gonna say only from Bien, but the - - Rispoli had indicated to her friends that he had been drinking.
>
> Q. And also to the nine eleven operator?
>
> A. I believe so, yeah.
>
> Q. And then when you spoke with Bien he told you that he had been drinking also?
>
> A. Yes, he did.
>
> Q. He told you he had been drinking an awful lot?
>
> A. Well, he said he had two pints of vodka - - I shouldn't say that. He told me he had one pint and he bought another bottle, I didn't push him on the size of the second bottle.
>
> Q. Vodka is not sold in anything less than a pint?
>
> A. I don't know.
>
> Q. But his demeanor was calm while he was talking to you?
>
> A. Yes.
>
> Q. And he did not appear to be drunk?
>
> A. No.
>
> Q. But nonetheless you ordered - - oh, you asked him if he would give blood?

| | |
|---|---|
| A. | Yes. |
| Q. | And he agreed to it? |
| A. | Yes, he did. |
| Q. | He voluntarily consented and you wanted to do this because you knew there was blood at the house and you obviously wanted to see if his blood matched that blood test? |
| A. | Well, it helps to eliminate the possibility of a third person. |
| Q. | You wanted to do it for comparison purposes? |
| A. | Yes. |
| Q. | Your weren't taking his blood to see if he was drunk at the time? |
| A. | No. |

. . . .

| | |
|---|---|
| Q. | The physician's assistant took the blood and it was going to the crime lab? |
| A. | Yes. |
| Q. | And the crime lab was going to do something with that blood, and at you instructions, isn't that right? |
| A. | Well, I don't think I filled out the form for the examination of the blood. |
| Q. | What I'm saying, the crime lab gets a sample of blood, they had to have some instructions, what do you want to do with this blood, find out the blood type DNA analysis? |
| A. | Yes. |
| Q. | And you could have instructed the crime lab to also do a blood alcohol content? |
| A. | I guess you could. |
| Q. | But you didn't? |
| A. | No. |
| Q. | Even though there was the allegations of alcohol use, you didn't do that? |
| A. | No. |

(Tr. at 810–12). In addition, Mr. Polsky asked Officer Accardi about the basis for his belief that the Peitioner was not intoxicated while at the hospital on the morning of June 7, 1998. (Tr. at 702). Therefore, the Court finds that Mr. Polsky made a

reasonable inquiry into the issue of the lack of a blood alcohol content test.  Finally, despite any alleged shortfall in Mr. Polsky's representation, he presented a vigorous, cogent defense of intoxication.  The Court finds that the petitioner has not satisfied *Strickland*'s prejudice prong because there is no "reasonable probability" that petitioner would not have been convicted if additional evidence of his intoxication was available at trial. *Strickland*, 466 U.S. at 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674.

Moreover, as noted above, Mr. Polsky immediately objected to the prosecutor's use of the word "murder" while cross-examining the Petitioner.  In addition, Mr. Polsky moved for a mistrial following the exchange in the jury's presence and again raised the issue in the Petitioner's motion to set aside the verdict pursuant to N.Y. C.P.L. § 330.40(1).  Therefore, the Petitioner has failed to show that trial counsel was ineffective and his petition for habeas corpus relief on this ground is denied.

### 2.    Ineffective Assistance of Appellate Counsel

The Petitioner further contends that he was denied the effective assistance of appellate counsel.  Specifically, the Petitioner stated that his appellate counsel failed to raise the following issues:  (1) the issue of trial counsel's ineffective assistance; (2) the denial of an impartial forum; and (3) the alleged "numerous" instances of prosecutorial misconduct.  Bien states that he sought to file a *pro se* supplemental appeal brief, but this request was denied by the Second Department.  Thereafter, Bien filed an application for a writ of error coram nobis for ineffective assistance of

appellate counsel.  As stated above, this petition was denied by the Second

Department on November 22, 2004.  *See People v. Bien*, 12 A.D.3d 615, 784

N.Y.S.2d 376 (2d Dep't 2004).  The New York Court of Appeals also denied leave to

appeal this decision.  *People v. Bien*, 4 N.Y.3d 796, 828 N.E.2d 88, 795 N.Y.S.2d 172

(2005).

The test set forth in *Strickland* applies equally to claims of ineffective

assistance of appellate counsel as it does to the assistance of trial counsel.  *Covington

v. Lord*, 275 F. Supp. 2d 352, 356 (E.D.N.Y. 2003) ("Although the *Strickland* test was

formulated in the context of an ineffective assistance of trial counsel claim, the same

test is used with respect to claims of ineffective assistance of appellate counsel.)"   In

attempting to demonstrate that appellate counsel's failure to raise a claim constitutes

deficient performance, it is not sufficient for the habeas petitioner to merely show that

counsel omitted a nonfrivolous argument.  *Jones v. Barnes*, 463 U.S. 745, 754, 103 S.

Ct. 3308, 77 L. Ed. 2d 987 (1983).  An appellate counsel who files a brief on the

merits of a criminal appeal need not raise every nonfrivolous claim, but rather may

select from among them in order to maximize the likelihood of success.  *Smith v.

Robbins*, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L. Ed. 2d 756 (2000) (citing *Jones*,

463 U.S. 745, 103 S. Ct. 3308, 77 L. Ed. 2d 987).  A petitioner may establish

constitutionally inadequate performance only if he shows that counsel omitted

significant and obvious issues while pursuing issues that were clearly and significantly

weaker.  *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000); *Mayo v. Henderson*, 13

F.3d 528, 533 (2d Cir. 1994).

The Petitioner was represented on appeal by Robert C. Mitchell, Esq., an attorney in the appeals bureau of the Legal Aid Society. On appeal, Mr. Mitchell raised and fully developed four primary arguments: (1) that there was a reasonable view of the evidence that the Petitioner did not intend to kill Rispoli, but only intended to cause her serious physical injury; (2) that the trial court erred when it denied the defense application to present psychiatric evidence concerning a defense of extreme emotional disturbance; (3) that the trial court erred when it refused the defense request that it charge the jury on the issue of extreme emotional disturbance; and (4) that the sentence of twenty-five years to life imprisonment was harsh and excessive and should have been reduced to a fifteen year to life term.

Essentially, the Petitioner argues that appellate counsel failed to make the same claims as are raised in this Section 2254 petition, that is, alleged ineffectiveness of trial counsel; the alleged denial of an impartial forum; and alleged prosecutorial misconduct. As discussed previously, the Court has reviewed each of these claims and has determined that they are without merit. Appellate counsel acted reasonably in foregoing weaker, frivolous, or unpersuasive arguments in favor of more significant issues. Accordingly, the Court concludes that the Appellate Division properly determined that Bien's appellate counsel's performance fell well within the "wide range of professionally competent assistance" required under the Sixth Amendment to the Federal Constitution. *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052, 80 L.Ed.2d 674.

### III.    CONCLUSION

Based on the foregoing, the Court finds that the state courts' determinations were not contrary to, or an unreasonable application of, clearly established federal law. Nor were they based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  Accordingly, the petition of Stephen Bien for a writ of habeas corpus is **DENIED**.

Pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure and 28 U.S.C. § 2253(c)(2), a certificate of appealability is **DENIED**, as the Petitioner fails to make a substantial showing of a denial of a constitutional right.  *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039, 154 L. Ed. 2d 931 (2003); *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000).

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York

April 19, 2007

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge